IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 11, 2005 Session

# THAD GUERRA, ET AL. v. STATE OF TENNESSEE

**Appeal from the Claims Commission for the State of Tennessee, Davidson County**
**No. 20201057     Stephanie Reevers, Commissioner**

_____

**No. M2004-02559-COA-R3-CV - Filed December 6, 2005**

_____

The issue presented in this appeal is whether the homeowners' suit against the State of Tennessee was timely filed. The homeowners filed a complaint with the Tennessee Claims Commission against the State of Tennessee for the alleged unconstitutional taking of their property in connection with the State's issuance of a permit to the homeowners to install a subsurface sewage disposal system. The Claims Commission ruled in favor of the State, finding among other things that the homeowners' claim was time barred. The applicable statute of limitations allows a landowner one year within which to commence an action for the taking of land after the landowner realizes or reasonably should realize that his or her property has sustained an injury that is permanent in nature. The homeowners contend that they did not realize that they had suffered permanent injury until the State eliminated the possibility that the injury to their property could be resolved. We affirm the judgment of the Claims Commission upon our finding that the homeowners should have reasonably realized that the injury to their property was permanent over one year prior to the time they filed their claim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed;**
**Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. Michael Swiney, J., joined.

Timothy W. Burrow, Nashville, Tennessee, for the Appellants, Thad and Darlene Guerra.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Kimberly J. Dean, Deputy Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee.

**OPINION**

Tad and Darlene Guerra purchased lot number 20 in the Scenic Ridge Subdivision in Wilson County, Tennessee in November of 1997. Prior to their purchase of the lot, the State of Tennessee's Department of Environment and Conservation ("TDEC") had approved the subdivision plat as

possessing suitable soil for the installation of a subsurface sewage disposal system ("SSDS"), such system being necessitated by the fact that the property is without access to a city sewer system.

On March 11, 1998, the Guerras applied for a permit to construct an SSDS on their lot. Prior to approval of an application for an SSDS, state regulations require that an employee of TDEC evaluate the lot upon which the system is to be installed to ensure that there have been no changes in the lot since the plat was signed and that the lot is still suitable for the construction of the SSDS contemplated. This evaluation entails review of the soil map and other pertinent data with regard to the property in question as well as an on-site inspection. Then, taking all of this information into account, the TDEC employee designs an SSDS for the lot, and issues a permit listing the size of the SSDS tank; the length, width and depth of disposal field lines; and other relevant information. In this case, the Guerras' lot was evaluated by a TDEC employee, Allen Schwendimann, who thereafter issued a permit for the construction of a conventional SSDS for the three-bedroom house the Guerras intended to build. The permit specified various conditions with respect to how the SSDS was to be installed and where it was to be located on the lot.

After obtaining the permit from TDEC, the Guerras began construction of their house and the SSDS, with such construction being overseen by Mr. Guerra. On October 21, 1998, after completion of construction, TDEC conducted an inspection of the property and determined that final approval of the SSDS should be denied upon grounds that space had not been reserved for a duplicate SSDS. Space for a duplicate system is necessitated by the fact that, over time, a septic system is likely to fail, and the reservation of an additional area with suitable soil ensures that there will be a ready location for the installation of a substitute system. In this case, Mr. Schwendimann had allotted a total of 8000 square feet of suitable soil as sufficient space for both the initial SSDS and a duplicate system. The permit issued to construct the SSDS also included specific limitations as to the distance that was to be maintained between the Guerras' house and the space set aside for the duplicate system and as to the allowed width of the Guerras' driveway. TDEC contends that the 8000 square feet allowed under the permit would have been sufficient to accommodate both the installed system and a duplicate system had the Guerras observed the specified limitations when they constructed their house and driveway. TDEC maintains that the Guerras are to blame for the fact that their system was denied approval because they failed to comply with these limitations with a resulting encroachment on, and loss of, the area that had been designated as suitable for the duplicate SSDS.

On January 20, 1999, TDEC mailed Mr. Guerra a letter advising him that final approval of the SSDS had been denied for lack of a duplicate area. A subsequent request for variance filed by the Guerras was denied in February of 1999, and the Guerras filed a *pro se* appeal with the Administrative Procedures Division. The appeal was assigned to an administrative law judge who heard the case on July 28, 2000. By order of August 1, 2000, *inter alia* the administrative law judge found as follows:

> The petitioners' SSDS on Lot #20 should not be approved. The system was constructed in violation of the conditions of the issued permit because it lacked a duplicate area for the disposal field of the SSDS. The Administrative Judge finds that the site is unsuitable for

a variance from the rules and regulations and that the Petitioners have not met the burden of proof to show otherwise. The Administrative Judge also finds that the Department has shown by a preponderance of the evidence that the property cannot be approved due to the lack of duplicate area.

The order denied the Guerras' request for approval of the construction of the SSDS and their request for a variance. The order was not appealed and became final on August 16, 2000.

On January 10, 2002, the Guerras filed a *pro se* claim against the State of Tennessee with the Division of Claims Administration. On April 8, 2002, their claim was transferred to the Tennessee Claims Commission and subsequently was amended by the filing of an amended complaint. The Guerras' complaint alleges that Mr. Guerra applied for a permit to construct a sewage disposal system and stated in the application that he planned to construct a three-bedroom house and that the State issued a permit on that basis and required installation of a conventional SSDS. The complaint asserts that, unbeknownst to Mr. Guerra when he constructed the house and the conventional SSDS, the Guerras' lot did not have sufficient suitable soil for the construction of a conventional SSDS and, therefore, it was not possible to construct a conventional SSDS on the lot that would be approved by the State. The complaint recites that the SSDS constructed by Mr. Guerra was not approved and as a consequence the Guerras could neither use nor sell the house, were unable to pay the mortgage, and had to file for bankruptcy. *Inter alia,* the complaint charges that "[t]he State committed an unconstitutional taking of the Guerras' property (consisting of the lot and the home that was constructed upon the lot) by issuing a permit for a SSDS that resulted in Guerras' loss of use and enjoyment of their home." In consequence of these and other allegations, the complaint requests compensatory and consequential damages under Tenn. Code Ann. §9-8-307(d).

On May 24, 2002, the State filed a motion for summary judgment in part upon grounds that "any claim for the unconstitutional taking of private property is barred by the statute of limitations." The State's motion for summary judgment initially was denied by order of the Claims Commission filed March 27, 2003. However, the State continued to assert that the Guerras claim was time barred at the trial of the case on March 30-31, 2004. On September 22, 2004, the Commission entered its judgment dismissing the Guerras' claim and ruling in favor of the State on every issue of law and fact, including the issue of whether the Guerras' claim was barred by the statute of limitation. Thereafter, the Guerras filed the present appeal.

Although several issues have been raised in this case, the sole issue we address is whether the Guerras' claim filed with the Claims Commission on January 10, 2002, was barred under the applicable statute of limitation. All other issues presented for our review are pretermitted by our decision as to this issue.

Tenn. Code Ann. § 9-8-403(a)(1) provides that a direct appeal from the Claims Commission is governed by the Tennessee Rules of Appellate Procedure. Accordingly, findings of fact by the Commission are reviewed *de novo* upon the record with a presumption of correctness, and such findings must be affirmed absent a preponderance of evidence to the contrary. Tenn. R. App. P. 13(d); *Learue by Learue v. State*, 757 S.W.2d 3, 6 (Tenn. Ct. App. 1987). Factual findings that

hinge upon a witness's credibility will not be reversed unless the witness's credibility is necessarily negated by clear, concrete and convincing evidence. *Pool v. State*, 987 S.W.2d 566, 569 (Tenn. Ct. App. 1998). The Commission's conclusions of law are reviewed *de novo* without a presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

Pursuant to Tenn. Code Ann. §12-1-206 and §29-16-124, an owner of private property has one year to commence a proceeding that claims that a governmental action constitutes an unconstitutional taking. In *Knox County v. Moncier*, 455 S.W.2d 153,156 (Tenn. 1970), our Supreme Court stated as follows regarding when this one year period begins:

> The statute of limitations should be applied in such a manner that the landowner will have the one year period within which to bring his suit "after injury or after reasonable notice or knowledge of such injury and damage." We would add to this that the landowner should have one year to commence his action after an injury to his property which reasonably appears to him to be a permanent injury rather than a temporary one. Only when the injury is permanent in nature can there be a "taking" within the contemplation of the statute; and until there is a "taking" the statute of limitations does not begin to run.
>
> . . .
>
> We do not hold that a property owner can sit idly by and wait to commence his suit at any time which is convenient with him, thereby circumventing the purpose of the statute of limitations. What we do hold is that the onus is on the property owner to institute his suit within one year after he realizes or should reasonably realize that his property has sustained an injury which is permanent in nature. At that time the 'taking' occurs and the statute of limitations begins to run. (citations omitted)

In its judgment of September 22, 2004, the Commission concluded as follows:

> [T]he Administrative Law Judge's Final Order [entered August 1, 2000,] reasonably should have put the Guerras on notice that any taking of their property by reason of the denial of their permit was permanent. The Guerras were therefore required to exercise due diligence to ascertain the pertinent facts within one year of this occurrence and to initiate suit. The proof demonstrates that they did not do so and therefore the Commission concludes that the claim should be dismissed as time barred.

The Guerras contend that the Commission's conclusion that their claim is barred by the statute of limitation is erroneous. The Guerras assert that after Mr. Guerra received the above noted order of the administrative law judge, he engaged in conversation with Larry Matthews, an employee

of TDEC, who told him "that they needed to look into the possibilities of an experimental system." The Guerras state that Mr. Guerra "told Mr. Matthews that it would be easier to locate the [field] lines the following summer (of 2001) and Mr. Matthews then said that it would be better to have Tom Petty come out to the property then to determine how much suitable soil was available."

The Guerras and TDEC met on the property on August 31, 2001. A field activity report prepared by TDEC on that date describes the meeting, notes that the SSDS permit was previously denied because there was no provision for a duplicate area and includes the following:

> Apparently, easements are not options on any adjoining lots. There is definitely not enough suitable soil for the construction of a second conventional SSD system. Whether there is enough suitable soil for an experimental or advanced treatment system cannot be determined at this time. The two options that came to mind were the Puraflow peat biofilters made by Bord Na Mona (observed in southern Alabama) and the AeroDiffuser system made by Zabel.

The report further notes that Mr. Guerra was instructed by TDEC to have a survey map made of the property to determine the location and suitability of all soils and that Mr. Guerra was informed of the necessity of a restrictive covenant with respect to both systems.

Thereafter, Mr. Guerra had a survey map made of the property, and this map was presented to TDEC. On October 25, 2001, TDEC issued an additional field activity report. The report acknowledges that Mr. Guerra was advised to have the survey performed "in hopes that some soil might be found to accommodate an experimental SSD system." However, the report states that the survey "map indicates that there are no significant areas for any experimental systems on lot #20" and that "[b]ecause there are no options for either experimental or ATS systems, the TDEC-GWP central office staff has removed itself from this process."

Based upon these facts, the Guerras present the following arguments that their claim of January 10, 2002, was filed within the one year statute of limitation:

> First, the injury was not permanent until TDEC decided it was so on October 25, 2001. As shown above, TDEC stated itself that "whether there is enough suitable soil for an experimental or advanced treatment system cannot be determined at this time." To conclude that the Guerras should have known that the property damage was permanent before then is to conclude that the Guerras should have known more than TDEC knew. TDEC's representatives are the experts, not the Guerras. Also, the Guerras had to follow TDEC's instructions and conclusions, not the other way around.
>
> The second argument in favor of the Guerras' position that its claim was filed within the one year statute of limitations is that the Guerras could not have expedited TDEC's discovery that the injury was

permanent. It is important to note that it was TDEC that did not conclude that the injury was permanent by virtue of advising the Guerras that an experimental system is a possibility. Moreover, it was TDEC that determined on October 25, 2001 that the injury was permanent, by concluding that there were no options for either experimental ATS systems. The Commission's concluding that the Guerras did not exercise due diligence in discovery that the damage was permanent is to say that the Guerras should have done more to expedite TDEC's determination that the injury was permanent. The critical fact, however, in which the Commission failed to mention and apparently failed to consider, is that the State instructed Mr. Guerra to wait until summer to meet at the site. Then at the meeting, it instructed Mr. Guerra to cause maps to be done. He did so and gave it to the State before October 25, 2001, which is less than two months. Before receiving the instructions from the State, what was Mr. Guerra to do, and how could he have expedited the State's decision that was made on October 25, 2001? The Guerra's claim was filed on January 10, 2002. Therefore, the Guerras filed their claim within a year of the time they should have discovered that the damage was permanent.

Given that the Commission did not take into consideration these facts and that it can only be concluded that the Commission's decision was based on the only fact cited in support of its decision, which was that "no action appears to have been taken with respect to this possibility [of an experimental SSDS] until more than a year after the Administrative Law Judge's order", this Court should reverse the ruling. No action was taken only because the State instructed Mr. Guerra to wait.

The Guerras reference the following trial testimony of Mr. Guerra in support of their above noted assertions regarding the conversation that Mr. Guerra had with Larry Matthews after Mr. Guerra received the administrative law judge's order of August 1, 2000:

Q. Now, did you have a conversation with anybody with regard to the possibility of an experimental system working on your lot after you received the Order from the administrative judge denying your request for a variance?

A. Larry Matthews.

Q. What did he tell you?

A. He told me that we needed to look into the possibilities of an experimental system. I didn't even know there was such a thing.

-6-

Q. Did he act as though it was viable, just a crap shoot, you know, I mean, what kind of impression did he give you?

A. Well, at the time we were looking for any option possible, so we took this as really good news.

Q. What did he say as far the process of going about pursuing an experimental system?

A. Well, in the variance hearing - - not so much in the variance hearing, but I believe here Mr. Matthew testified he never saw the lines. He had mentioned to me that seeing the lines would be a whole lot easier to determine how much suitable soil was available because apparently the experimental system takes up less or more; I'm not an expert on those. He says that would help determine that.

Q. Is this suitable soil for an experimental system as opposed to suitable soil for a conventional system?

A. I don't know if they're one in the same, but that was my understanding.

Q. Go ahead and proceed.

A. I told him that during the summer, during the dry months, that you could see our field line because the grass was a lot greener. It was like the drawing. I mean, you could see it. And he had mentioned that it would be better to have Tom Petty come out and be able to see that when that was in that place, which was in the summer.

Q. Did that happen that following spring?

A. No, I don't know why. I don't know if it rained more that year, but it never happened. Once it didn't happen, we went ahead and made the call and said it's not happening; we need to get this done.

Q. What happened after that?

A. Then the process started and Cory Hodge came out. He did the soil evaluation. I met with Greg Upham who apparently had been charged that.

In further regard to Mr. Guerra's conversation with Mr. Matthews, the Guerras reference Mr. Guerra's affidavit wherein he attests in pertinent part as follows:

I did not believe there was a permanent injury to the property until it was determined by the State on approximately October 25, 2001 that there were was no alternate system that could be installed. Prior to that time, I always considered the problem to be temporary. Very soon after the hearing on July 28, 2000, I had a conversation with Larry Matthews with the Division of Ground Water Protection of the [TDEC]. He said that there were new options for experimental systems that required less area. Through his direction, I had the lot surveyed, a new soils map done, and other investigations done on the lot so that the State could determine whether or not an experimental system could be installed

Upon careful review of the evidence in this matter, we are compelled to the conclusion that the the statute of limitations was not tolled by action of the TDEC and therefore the Guerras' claim of January 10, 2002 was not timely filed.

Mr. Matthews attests in his own affidavit filed on December 9, 2002, "I never informed Mr. Guerra that an alternative system was a viable option ... I merely told Mr. Guerra that there were alternative subsurface sewage disposal systems he could explore." We find nothing in either Mr. Guerra's referenced trial testimony or his affidavit which constitutes evidence that Mr. Matthews indicated to Mr. Guerra that the injury to his property was not permanent. Mr. Guerra testified that Mr. Matthews told him "that we needed to look into the possibilities of an experimental system." However, the Guerras had no reason to believe that the injury to their property was not permanent when the administrative law judge issued the order of August 1, 2000, or at any time thereafter. While the Guerras argue that they did not know that their injury was permanent until October 25, 2001, when it was determined that an alternative system would not resolve their problem, they do not present an adequate explanation as to why this determination could not have been made before the expiration of the one year they were allotted for filing their claim. According to Mr. Guerra's testimony, the optimum time for examining the system was "during the summer, during the dry months." Mr. Guerra is unable to explain why he did not have the matter resolved sooner than he did and merely states "Once it didn't happen, we went ahead and made the call and said it's not happening; we need to get this done." The evidence does not preponderate against the finding of the Commission that that the Guerras did not "exercise due diligence to ascertain the pertinent facts within one year" of the August 1, 2000 order of the administrative law judge.

For the foregoing reasons, we affirm the judgment of the Claims Commission and this cause is remanded to the Commission for further proceedings as are necessary consistent with this opinion. The costs on appeal are assessed against Thad and Darlene Guerra.

_____

SHARON G. LEE, JUDGE